UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                                      :
JOSEPH STEVENS & COMPANY, INC.,   :
                                                      :          Civil Action No.
                            Peitioner,        :          07 CV 3385 (BSJ)
                                                      :
           -against-                           :
                                                      :
DAVID CIKANEK,                            :
                                                      :
                            Respondent.   :
                                                      :
-------------------------------------------------------X


### DECLARATION OF MARTIN P. RUSSO
### IN SUPPORT OF APPLICATION TO VACATE

### EXHIBIT A

1    object during counsel's opening statement
2    because it's not permitted and it's rude and it
3    breaks the flow, but I do object to some of the
4    evidence he's claimed he's going to show you
5    based on the fact that they relate to the
6    Cikanek living trust which does not have a
7    claim in this action.  I move to strike those
8    portions of the opening that relate to the
9    Cikanek living trust.
10          This action was brought by Mr. Cikanek
11    individually and he does have an individual
12    account that he had at Joseph Stevens which was
13    an IRA and he did have individual accounts at
14    LCP, both an individual account and an IRA
15    account at LCP until approximately September of
16    2000, but the Cikanek living trust did not
17    bring a claim in this case nor did it sign a
18    submission agreement.  Illinois statute 760
19    ILCS 5 slash 4 basically says that only a
20    trustee has the power to commence litigation on
21    behalf of a trust.  The statement second of
22    trusts which has been cited in many cases here
23    in Illinois says it's the trustee who must
24    bring the claim on behalf of the trust and it's
25    only the trust that can recover just -- and

1          that includes grantors are not permitted to

2          bring a trust -- a claim on behalf of the trust

3          nor are the beneficiaries of the trust

4          permitted to bring a claim on the trust except

5          for certain special circumstances which are not

6          met here and I'll cite for you Godfrey versus

7          Cayman 2000 U.S. District Lexis 18, 213; Pierce

8          versus Chester Johnson Electric Corp., 117

9          Illinois Appeals 3rd, 867;

10         Levinfield (phonetic) versus Clinton, 1986 U.S.

11         District Lexis 27, 109 and U.S. versus

12         $2,767,202.27 which is 2006 U.S. District Lexis

13         47, 833, all of that law as well as the

14         restatement of trust section 177, 192 and 282,

15         that's the restatement of second of trusts.

16              In this case, the Cikanek living trust

17         has beneficiaries that are not Mr. Cikanek.

18         The beneficiaries are various brothers and

19         sisters and their progeny and so Mr. Cikanek is

20         not even the beneficiary of the trust but seeks

21         here apparently to recover individually for a

22         trust asset that being a claim a trust owns.

23         Importantly, this -- the exclusion -- and I'm

24         going to move to preclude any evidence with

25         respect to the Cikanek living trust.  The

1    preclusion of the Cikanek living trust would

2    not, in fact, materially affect this case

3    because the bulk of the losses that Mr. Cikanek

4    suffered were with respect to his individual

5    accounts which were at LCP and those losses

6    occurred primarily between I think it's April

7    of 2000 and September of 2000.

8         It was in September of 2000 that

9    Mr. Cikanek created his trust.  At the same

10   time at LCP, he had an IRA account which

11   suffered like something like several hundred

12   thousand dollars worth of losses.  That IRA

13   account went to Joseph Stevens and did, in

14   fact, suffer losses at Joseph Stevens and so

15   the preclusion of the Cikanek living trust

16   evidence will not in any way prevent this case

17   from going forward.  It would simply provide

18   Joseph Stevens the due process of law and the

19   reason why I say that is because the Cikanek

20   living trust did not submit to arbitration,

21   Joseph Stevens was unable to bring claims

22   against the Cikanek living trust as a trust

23   entity for a debit that they had incurred and

24   was forgiven by Joseph Stevens in the amount of

25   $40,000 and, in addition, Joseph Stevens was

Elisa Dreier Reporting Corp.   (212) 557-5558
780 Third Avenue, New York, NY 10017

1    unable to cross-claim against Mr. Cikanek for

2    his breach of fiduciary of care.  As a trustee,

3    he owed a duty of care to the trust and to

4    protect the assets of the beneficiaries and so

5    I ask you at this point to strike any portion,

6    without specifics, of the opening that relate

7    to that evidence and to going forward issue a

8    ruling which precludes Mr. Sugarman and Mr.

9    Cikanek from introducing evidence regarding the

10   Cikanek living trust account which is not at

11   issue in this case.

12           ARBITRATOR PEPPARD:  Anything further,

13   sir?

14           MR. RUSSO:  No, sir.

15           MR. SUGARMAN:  First of all,

16   Mr. Chairman and members of the panel, I think

17   this is the inappropriate time for this matter

18   to have been raised.  If Mr. Russo actually

19   believed that he had a legal motion of this

20   sort where he was going to be citing cases

21   trying to preclude or claim that there is a

22   certain party not involved, he's been more than

23   well aware that Mr. Cikanek's individual

24   account which was a living trust account was

25   part of this case, he could have made this

1    motion, could have made a written motion, could
2    have responded to it.

3         To raise this at this point before
4    we've introduced any testimony or evidence I
5    think is premature and early.  If he wants to
6    raise it at the end of our case, I suppose
7    that's also possible, but, number 2, he's
8    raising a very technical issue because clearly
9    they don't have any other way of defending this
10   case and I don't think that this is an
11   arbitration that such a technical issue is a
12   legitimate basis to bar Mr. Cikanek who is a
13   living trust when he is the only trustee and we
14   have no problem to take care of this very
15   technical issue that's being raised.

16        Mr. Cikanek can submit or sign a
17   uniform submission agreement on behalf of the
18   trust.  We could also move to amend our
19   pleading at the end of our case to include the
20   trust and we could submit, as I said, a uniform
21   submission agreement, if possible -- you know,
22   if necessary; however, I don't believe that at
23   this point there is any grounds or basis to
24   have this excluded from introducing any
25   evidence to this including the fact that

1       Mr. Cikanek's account recently was an

2       individual account and at some point it changed

3       to a living trust, so I really think that the

4       motion is premature and also I think it's just

5       a technicality that Mr. Russo is raising which

6       has no basis and the argument I would finally

7       argue and point out that this argument that

8       they're precluded from bringing a counterclaim

9       against Mr. Cikanek for breach of fiduciary

10      duty is a specious argument because if you

11      don't represent the beneficiary of the trustee

12      and to the extent there was some basis for a

13      breach of fiduciary duty claim, that would be

14      something that wouldn't be brought by Joseph

15      Stevens who are the ones who facilitated and

16      who were the basis for the living trust losing

17      all the money being brought by the beneficiary,

18      that's something that would be up to them to do

19      and not Joseph Stevens, so their argument that

20      they've somehow been denied some due process

21      right or whatever I think is not a valid

22      argument.

23          So I would suggest that this motion be

24      denied and to the extent that counsel is

25      concerned about some technicality, we'll move

1      to amend our pleadings and include the trust as

2      a claimant and we'll submit a submission

3      agreement on behalf the trust and Mr. Cikanek

4      as the trustee.

5          MR. RUSSO:  If I might be heard for one

6      moment -- I'm sorry, were you done, I didn't

7      mean to interrupt?  If I could be heard for the

8      moment, it's important to point out that there

9      was never a Cikanek individual account other

10     than the IRA at Joseph Stevens.  The account

11     didn't go to Joseph Stevens until November of

12     2000 so the Cikanek living trust account was

13     the only incarnation of this account at Joseph

14     Stevens.  Also, yes, Mr. Sugarman is right

15     Joseph Stevens wouldn't bring a claim for

16     breach of fiduciary duty, but they'll bring a

17     claim for contribution based on his breach

18     fiduciary duty.

19          It's still the same underpinnings and

20     we can't possibly at this point in time do

21     that.  It's too late.  We've started.  The

22     issued has been joined in this case.  The

23     claimant's opening has started.  To try to

24     amend now wouldn't be fair to Joseph Stevens

25     and I have to point out there is nothing

1    preventing Mr. Cikanek from bringing a case

2    against Joseph Stevens on behalf of the living

3    trust properly as he should have.

4            In this case, the uniform submission

5    agreement is very clear.  It's David Cikanek

6    individually and all of the pleadings are

7    clear, it's David Cikanek individually and so

8    we shouldn't have to come here and fight over

9    the Cikanek living trust.  We did not make --

10   do certain things including bringing

11   cross-claims and counterclaims based on the

12   fact that this was an individual case.

13           MR. SUGARMAN:  Could I say one brief

14   response?

15           ARBITRATOR PEPPARD:  Yes, sir.

16           MR. SUGARMAN:  Thank you.  Mr. Russo

17   what he just stated I think points out why the

18   motion should be denied against.  It suggests

19   we bring another claim against Joseph Stevens

20   on the -- for the Cikanek living trust.  The

21   evidence and the testimony would be all the

22   same, so he basically wants us to duplicate our

23   efforts twice just as a matter of some

24   technicality.  It doesn't make any sense.

25   That's what arbitrations are about.  They're

1    supposed to avoid all of the legal

2    technicalities that Mr. Russo is trying to

3    raise and allow a party to present his case and

4    present his evidence not to have to come here

5    and then file the same claim again because the

6    issue has supposedly been joined because I made

7    an opening statement and then have us to

8    introduce the same testimony over again.  It's

9    very simple.

10        If the panel is concerned about they're

11    not being technically, the living trust as

12    party can amend, we'll submit a submission

13    agreement.  The same evidence would be

14    presented if we would bring another claim which

15    would just be duplicative and a waste of

16    everybody's time and effort, so I, again,

17    suggest that the motion should be denied.

18        MR. RUSSO:  That is factually

19    incorrect.  The evidence with respect to the

20    Cikanek living trust involves different trades,

21    different trading, different time periods.

22    It's not the same evidence that would be

23    introduced with respect to the IRA and also I'd

24    like to point out that what Mr. Sugarman

25    basically just did was say to you this is

1   arbitration so ignore the law, it doesn't

2   matter that this claimant didn't bring a claim

3   against them, just bring it in now and let's

4   have some quick justice here and it's manifest

5   disregard to the law if you do it.

6           MR. SUGARMAN:  It is absolutely not

7   manifest disregard to the law.

8           ARBITRATOR PEPPARD:  Let's do a couple

9   of things factually here if we can.  First,

10  Mr. Sugarman, what I have in my pleading file

11  includes under date of April 7th, 2006, a

12  letter formatted signed by yourself on behalf

13  of Mr. Cikanek, you have that document?

14          MR. SUGARMAN:  Yes, sir.

15          ARBITRATOR PEPPARD:  So your statement

16  of claim is in that format under that date

17  signed by yourself on behalf of Mr. Cikanek.

18  When I turn to the second page of that

19  document, I see a reference to two accounts and

20  it isn't clear to me what those two accounts

21  are except that one of them is described as a

22  margin account and the other by number is

23  described as an IRA account.  Can you give us a

24  little more description of those?

25          MR. SUGARMAN:  Absolutely.  What's been

1      to do, sir.

2           ARBITRATOR PEPPARD:  Oh, I beg your

3      pardon.  I thought we had done that.

4           MR. RUSSO:  And I object to proceeding

5      because it's going to cost us days.

6           ARBITRATOR PEPPARD:  Your objection is

7      heard, sir.

8           MR. RUSSO:  I also have the problem

9      which is right now if you're going to make us

10     go forward, I need the opportunity to amend my

11     answer to assert a counterclaim and a

12     cross-claim, so I mean you can't go forward on

13     the evidence with respect to one side without

14     permitting me to go forward with the evidence

15     on the other side.

16          The issue has been joined with respect

17     to the individual account.  If now there is

18     even the chance that at some point later on the

19     panel might decide that with respect to the

20     Cikanek living trust that you're going to

21     accept the evidence, then I will have been

22     injured because I will not have been able to

23     assert my counterclaim nor my cross-claim and

24     so I urge you to consult with the full panel

25     and to make a ruling either at this time or if

1    you cannot do that to adjourn and seek having

2    the parties submit briefs or something like

3    that because it's just not fair to Joseph

4    Stevens from a due process standpoint for us to

5    have to go forward without asserting our claims

6    as they could have been asserted had the

7    Cikanek living trust submitted a uniform

8    submission agreement and agreed to be party to

9    this action.

10            ARBITRATOR PEPPARD:  Thank you very

11   much.  Do you have anything more by way of

12   opening statement?

13            MR. RUSSO:  Yes, I do.

14            ARBITRATOR PEPPARD:  Let's hear that.

15            MR. RUSSO:  The evidence in this case

16   is going to show you that Joseph Stevens is not

17   your run of the mill brokerage firm.  It's a

18   very implied brokerage firm.  It's a firm that

19   has put in very good procedures and that it's a

20   victim of circumstance by virtue of the fact

21   that Mr. Cikanek came to Joseph Stevens with

22   Ross Inserra, Leonard Inserra and Kevin Brody.

23            Whatever those gentleman did at LCP,

24   they did not do at Joseph Stevens and you'll

25   see when you look at the evidence of both

1          transferred your account from -- your accounts

2          from Silver Capital to Joseph Stevens?

3              A.   Yes.

4              Q.   Do you recall when that was?

5              A.   Not offhand, no.

6              Q.   Was it sometime in 2000?

7              A.   Yes.

8              Q.   And how did that come about, how did

9          you come to transfer your accounts there?

10             A.   Ross told me that he was moving to

11         Joseph Stevens because there was some internal

12         problems at Silver Capital.

13             Q.   Internal problems?

14             A.   Yes.

15             Q.   And did Ross ask you to go with him to

16         Joseph Stevens?

17             A.   Yes.

18             Q.   Follow him there?

19             A.   Yes.

20             Q.   And did you, in fact, transfer your

21         account to Joseph Stevens?

22             A.   Yes.

23             Q.   Now, when you got to Joseph Stevens,

24         did the manner in which you described your

25         account being handled did it change in any way?

1        entity?

2             A.    No.

3             Q.    No.   Why did you establish a trust?

4             A.    To avoid -- I can't think of the word,

5        it starts with a P, probate, and it would save

6        me in taxes.

7             Q.    You understood that this would be a

8        vehicle that you could use to avoid probate and

9        save taxes?

10            A.    Yes.

11            Q.    And you were seeking the protection of

12       the laws of the state of Illinois in order to

13       do that, correct?

14            A.    No, I didn't think of it in that way.

15            Q.    Did you have to go through a process

16       and sign a legal document to establish a trust?

17            A.    Yes.

18            Q.    I hand you what I marked as

19       Respondents' A, can you look at Respondents' A,

20       sir, and tell me what that is?

21            A.    It says trust agreement of David

22       Michael Cikanek, David Menachof Law Office,

23       6723 West Cermak Road, Berwyn, Illinois 60402.

24            Q.    I'd ask you to look at the third from

25       the last page or fourth from the last page, it

93

1       says page 13 at the bottom?

2           A.    Page 14?

3           Q.    Page 13 it says at the bottom.

4           A.    Yes.

5           Q.    Can you tell me whether your signature

6       appears anywhere on this document, sir?

7           A.    Yes.

8           Q.    Where does it appear?

9           A.    Below where it says testimonium clause,

10      it says David M. Cikanek and that's my

11      signature and it says David M. Cikanek,

12      trustee.

13          Q.    Did you, in fact, execute this

14      document, sir?

15          A.    Yes.

16          Q.    Now, I ask you to turn to page 4 of

17      this document, four at the bottom?

18          A.    Page 4.

19          Q.    Could I ask you who Darlene Simmons is?

20          A.    She's my sister.

21          Q.    And who is Rosemary Gretasi (phonetic)?

22          A.    Gretasi, my sister.

23          Q.    I believe you testified earlier that

24      you were not married, sir; is that right?

25          A.    Correct.

94

```
 1          Q.   And you've never been married?
 2          A.   Correct.
 3          Q.   Do you have any children?
 4          A.   No.
 5          Q.   Was the purpose of establishing this
 6     trust so that your assets would pass to your
 7     sister and -- your sisters and their children
 8     without having to go into probate?
 9          A.   No, it was to pass it along to them.
10     It didn't -- I didn't bring probate into it.
11          Q.   You just wanted to pass it along to
12     them?
13          A.   Yes.
14          Q.   They were the beneficiaries of this
15     trust?
16          A.   Yes.
17          Q.   And they still are the beneficiaries of
18     this trust?
19          A.   Yes.
20          Q.   Are they still alive, sir, both of your
21     sisters?
22          A.   Yes.
23          Q.   Now, we were asking you about income
24     sources and you said one other income source
25     was this real property, the income property
```

99

1          A.   Yes.

2          Q.   What did you do when you received a

3     confirmation for your trade?

4          A.   I looked at the value of the stock and

5     the amount of money.

6          Q.   Why were you looking at that?

7          A.   Because I was concerned I was earning

8     money or losing money.

9          Q.   Well, I'm not talking about account

10    statements, sir, I'm talking about individual

11    confirmations for every trade?

12         A.   Well, I was sent -- aware of what Ross

13    was doing with my money and I wanted to see,

14    you know, what -- where the money was going,

15    what stock.

16         Q.   So let's rewind a second, sir, did you

17    or did you not receive a confirmation for every

18    trade that was done in your account?

19         A.   Yes.

20         Q.   And when you got those confirmations,

21    what did you do with them?

22         A.   I looked at them and then I would call

23    Ross and ask him about the trade.

24         Q.   And you understood when you received

25    those confirmations, did you not, sir, that a

100

1      trade had been done in your account?

2          A.   Yeah, I understood that because it said

3      trade confirmation.

4          Q.   And how often did you call the firm LCP

5      or Joseph Stevens and say I did not authorize

6      this trade, please reverse it?

7          A.   Never.

8          Q.   Am I correct that after seeing the

9      trade confirmations and discussing it with

10     Ross, you accepted the trade?

11         A.   I didn't know I could reject it at that

12     point.

13         Q.   You had no idea that you could say I

14     didn't do this trade?

15         A.   No.

16         Q.   You never learned that throughout the

17     entire time you were investing?

18         A.   No, and Ross never told me I could.

19         Q.   But clearly after you got stuck with a

20     couple of trades you didn't want, you said to

21     Ross I'm not sending you any more money; is

22     that right?

23             MR. SUGARMAN:  Objection, he's

24         mischaracterizing his testimony.  He just

25         said --

101

BY MR. RUSSO:

    Q.    Let me ask did you ever get stuck with
a trade you didn't want?

    A.    Yes, all the trades that lost money and
as far as I'm concerned, they all lost money.

    Q.    So you weren't --

    A.    But I felt that I lost control of my
portfolio and it was in the hands of Ross who I
trusted and he assured me that there was no
concern for alarm.

    Q.    At what point did you make the decision
that you didn't want the trade, was it at the
point that the trade was done that you received
the confirmation or was it after the trade was
closed and you lost money?

    A.    It's not -- the way I felt it's not
that I didn't want the trade, I felt it was too
late and what was done was done.

    Q.    Why didn't you instruct Mr. Inserra to
sell the stock that he had purchased without
your authorization?

    A.    Because they already lost money.

    Q.    But if you still had the stock, wasn't
there a chance that you were going to continue
to lose money?

102

1      A.    There's always that chance.

2      Q.    So you knowingly accepted that risk

3    when you didn't instruct Mr. Inserra to sell,

4    correct?

5      A.    I -- Ross told me there was -- I

6    shouldn't be alarmed, that it would come back.

7    He would take care of it and it could come

8    back.

9      Q.    But you understood that there was a

10    risk that you were going to lose money,

11    correct?

12      A.    Correct, because there is always a

13    risk.

14      Q.    And so in not instructing Mr. Inserra

15    to immediately sell, you knowingly undertook

16    that risk, didn't you?

17      A.    Yes.

18      Q.    Now, in addition to the confirmations,

19    you also received monthly statements, correct?

20      A.    Correct.

21      Q.    And you had received the statement for

22    the prior month about the middle of the

23    following month, correct?

24      A.    Correct.

25      Q.    And while you were at -- while you had

104

1          Q.    Let's assume for the moment --
2     withdrawn.
3                Would you say you lost at least 400,000
4     while you were at LCP?
5          A.    I don't know for sure.
6          Q.    Do you know whether it was hundreds of
7     thousands that you lost at LCP?
8          A.    Yes.
9          Q.    After having lost hundreds of thousands
10    at LCP, why is it that you followed Mr. Inserra
11    to Joseph Stevens & Company?
12         A.    I followed him because he asked me to.
13    He said he would get my money back for me.
14         Q.    At any point did you tell Joseph
15    Stevens that you were dissatisfied with the
16    stock that Mr. Inserra had been recommending to
17    you because at LCP you had lost several hundred
18    thousand dollars?
19         A.    No.
20         Q.    In fact, when you got to Joseph
21    Stevens, you filled out a new account form,
22    didn't you?
23         A.    Yes.
24         Q.    And on that new account form, you
25    represented that you had a million in net

Elisa Dreier Reporting Corp.   (212) 557-5558
780 Third Avenue, New York, NY 10017

105

1    worth?

2        A.   No, I didn't.  Ross put that in.  I

3    signed the form.

4        Q.   You signed the form and didn't you also

5    sign the form that said you had 100,000 in net

6    income?

7        A.   Ross also filled that in.

8        Q.   So Ross filled that out but you signed

9    that, sir?

10       A.   Yes, but --

11       Q.   Okay.  Let me just ask --

12            MR. SUGARMAN:  Can he finish answering?

13            MR. RUSSO:  I'm asking yes or no

14       questions.  I'd ask that counsel

15       rehabilitate him if he needs to but that we

16       move this along.

17            MR. SUGARMAN:  Chairman, he was in the

18       middle of answering when he was cut off and

19       I think he cut off his answer.

20            ARBITRATOR PEPPARD:  Did you have

21       anything else to add, sir?

22            THE WITNESS:  Yeah, he had a sticker

23       pointing to where I should sign.  Everything

24       wasn't filled in and I just signed it and he

25       would send a return overnight envelope.  He

1                  JEFFREY E. SCHAFF

2          MR. RUSSO:  I'd just like to note for the

3    record my continuing objection to evidence with

4    respect to the Cikanek living trust, is not a party

5    to this action.

6          ARBITRATOR PEPPARD:  We'll consider that

7    you have a standing objection to all evidence with

8    respect to the trust.

9          MR. RUSSO:  Thank you, sir.

10   BY MR. SUGARMAN:

11       Q.   Mr. Schaff, can you walk us through this

12   profit and loss report starting with this account

13   summary?

14       A.   Most certainly.

15            The profit and loss reports and, actually,

16   there are a number of tabs where they'll all appear

17   to be generally similar, they're in the same format.

18   The very first page for each would be the accounts

19   summary.  There are three boxes of information in

20   each -- captioned by the exact account numbers but

21   are time frames that are captioned profit and loss.

22            The two top boxes are two entirely

23   different ways to generate a profit and loss.  The

24   first being simply cash flow.  If you know how much

25   monies, securities went into an account and out of